UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF MONTANA

| | |
|---|---|
| In re<br><br>**JAMEY R. EISENBARTH**,<br><br>Debtor. | Case No. **10-61326-7** |
| **SECURITY FIRST BANK**,<br><br>Plaintiff.<br><br>-vs-<br><br>**JAMEY R. EISENBARTH**,<br><br>Defendant. | Adv No. **10-00083** |

# MEMORANDUM of DECISION

At Butte in said District this 15th day of July, 2011.

In this Adversary Proceeding, after due notice, trial was held June 6, 2011, in Billings on Plaintiff Security First Bank's complaint to deny Debtor/Defendant Jamey R. Eisenbarth's ("Jamey") discharge under 11 U.S.C. §§ 523(a)(2) and 523(a)(6). Security First Bank was represented at the trial by Eli J. Patten of Billings, Montana; Jamey was represented by Mark Hilario of Billings, Montana. Jamey, Ronald Peters ("Ron"), Don Middleton and Karen Eisenbarth ("Karen") testified. Security First Bank's Exhibits 1 through 39, 41, 42 and 43 were admitted into evidence. At the conclusion of the trial, the Court granted the parties time to file post-trial briefs. The briefs have been filed and the matter is now ready for decision. This

1

Memorandum of Decision includes the Court's findings of fact and conclusions of law.

BACKGROUND

In their pretrial order filed May 27, 2011, and approved May 31, 2011, the parties agreed that Jamey started Eisenbarth Motor Company in December of 2000 and commenced operation of a Chrysler automobile dealership in Chadron, Nebraska. Jamey operated the Chrysler automobile dealership under the name Eisenbarth Motor Company ("EMC").

Plaintiff Security First Bank loaned money to Jamey from the commencement of EMC for both the purchase of the business and for the flooring credit of EMC's used vehicle inventory. Security First Bank extended a flooring line of credit to EMC.

On May 23, 2007, Jamey and the shareholders of EMC advised Ron, a bank officer at Security First Bank, that vehicles financed under the flooring plan and subject to Security First Bank's security interest were sold and the proceeds were not delivered to Security First Bank in breach of the agreement between EMC and Security First Bank.

Additional facts were established at trial. Jamey and his then spouse, Karen, had a 75% ownership interest in EMC. Karen's parents, Jay and Hermine Loughry, owned the remaining 25% interest of EMC. In December of 2000, EMC purchased an auto dealership with money it borrowed from Security First Bank. Security First Bank also granted EMC a line of credit with which to purchase used car inventory.

EMC's line of credit with Security First Bank was increased as EMC grew. In 2002, each of the shareholders of EMC executed personal guarantees for the obligations to Security First Bank.

Ron testified that EMC's flooring plan with Security First Bank operated smoothly over

the life of Security First Bank's relationship with EMC. Ron testified that Security First Bank conducted inspections of its collateral at approximately 6 week intervals and never had a problem with any of its inspections. Throughout its relationship with EMC, Security First Bank requested and received periodic financial statements from the shareholders, and regularly received year to date Daimler Chrysler Dealer Financial Statements. Additionally, EMC provided Security First Bank with copies of EMC's annual corporate tax returns. The shareholders of EMC also provided copies of their annual income tax returns to Security First Bank. Up until the summer of 2006, EMC was, in Ron's words, fairly successful.

    The year 2006 proved to be a difficult year for EMC and 2006 was made more difficult when in October 2006, Jamey received notice from Chrysler that Jamey and the other shareholders of EMC needed to inject a substantial sum of cash into EMC in order to increase EMC's working capital. In response to Chrysler's notification, the shareholders of EMC approached Ron inquiring whether Security First Bank would loan EMC additional funds to meet Chrysler's additional capital requirements.

    Ron testified that Security First Bank relied upon the monthly profit and loss statements, balance sheets and other financial information provided by EMC and its shareholders. Ron testified that EMC's financial statements caused some concern in 2006, but the concern was not significant enough to terminate the lending relationship. However, based upon EMC's profit and loss statements for 2006, Ron was not interested in advancing EMC or its shareholders additional funds because Ron believed that EMC did not have the wherewithal to pay additional term debt. Ron never presented EMC's request for additional working capital to Security First Bank's Senior Loan Committee.

Following the meeting with Ron in October 2006, the shareholders of EMC undertook to secure additional working capital for EMC from other sources. The shareholders first took a boat owned by EMC and a camper trailer owned by Jay and Hermine Loughry and added the items to EMC's line of credit with Security First Bank, thus using the boat and camper trailer as a means of securing additional cash from EMC's line of credit with Security First Bank. Under its agreement with Security First Bank, EMC was not precluded from using its line of credit at Security First Bank to purchase boats and camper trailers. However, because EMC had purchased only a few camper trailers and had never purchased a boat, Ron asked Jamey what was going on. Jamey explained to Ron that the boat and camper trailer were corporate-owned assets that the shareholders agreed to sell. Security First Bank advanced $35,000 on the 2001 Keystone camper trailer and when Security First Bank tried to repossess the camper trailer, they were told it was in Jay Loughry's possession. The boat was listed for sale, ultimately sold and the funds borrowed on the line of credit were repaid to Security First Bank.

In addition to adding the boat and camper trailer to EMC's line of credit, Jamey and Karen also borrowed $150,000 from a friend and cashed out their retirement accounts. Jamey also cut his salary by one-half and started laying off staff, eventually operating EMC on a skeletal crew. Jamey testified that he stepped in as sales manager trying to sell as many cars as he could, while Karen was overseeing EMC's books. Jamey and Karen were working almost nonstop while they tried to find either a buyer for EMC or an additional source of funding. Karen testified that they even explored selling just the real estate on which EMC conducted its car business, but EMC's rent factor would have gone up, making it even more difficult for EMC to meet its expenses. Karen also spent considerable time preparing proposals in an effort to secure

new financing, to no avail.

Karen explained that she prepared her financial reports on software that is specific to the auto industry with a module that is specific to Daimler-Chrysler. Because she was wearing numerous hats in 2007, Karen testified she was extremely behind in getting her book work done for EMC. In March and April of 2007, EMC's payables were well-aged. EMC was doing little warranty work because it could not afford to send its technicians to school and EMC's collections were past 60 days.

As previously noted, Security First Bank never saw any reason for concern during any of its inspections at EMC, including the inspection Security First Bank performed in late April of 2007. However, sometime between Security First Bank's inspection in late April 2007 and mid to late May 2007, EMC sold used cars that were subject to Security First Bank's security interest, and failed to remit the sales proceeds to Security First Bank. Karen testified that while in the process of putting EMC's financial statements together for Daimler-Chrysler on or about May 22, 2007, she learned that EMC was "out of trust" with Security First Bank. The shareholders of EMC went to Ron at Security First Bank the next day and advised Ron that EMC was out of trust and provided Ron with a list of 39 vehicles that had been sold, and for which EMC did not have the funds to pay Security First Bank. The shareholders of EMC also advised Ron during the meeting on May 23, 2007, that Daimler-Chrysler had someone on site at the dealership overseeing the selling of cars. Ron shut off EMC's financing immediately following the May 23, 2007, meeting. Ron also testified that Daimler-Chrysler's actions in May of 2007, put Security First Bank at a disadvantage.

Don Middleton ("Don") was previously employed with Daimler-Chrysler. After Don

retired, he continued to do contract work for Daimler-Chrysler at troubled dealerships. In May of 2007, Daimler-Chrysler sent Don to EMC. Don testified that he was onsite at EMC for approximately 3 or 4 months, but Don had no control over EMC, its bank accounts or what cars were sold. Don explained that he left EMC once Daimler-Chrysler was paid in full.

As noted earlier, Ron testified that Security First Bank relied on the financial information provided to Security First Bank by EMC and its shareholders. Karen testified that many of the financial statements provided to Security First Bank were the financial statements produced with the Daimler-Chrysler software. Karen would enter information into the computer and the software would populate the financial forms. Karen also testified that she prepared many of the personal financial statements submitted to Security First Bank. Karen often completed hers and Jamey's financial statements by simply running a new credit report. While numerous personal financial statements of Jamey's that were prepared by Karen are not signed, Jamey did not dispute that the financial statements were his. Karen testified that the personal balance sheets were always accurate as of the date they were prepared.

## APPLICABLE LAW

First Security seeks nondischargeability of a State Final Consent Judgment under 11 U.S.C. §§ 523(a)(2)(A), 523(a)(2)(B) and 523(a)(6). It is well-settled that the Bankruptcy Code's central purpose is to provide a fresh start to the honest but unfortunate debtor. *See Grogan v. Garner*, 498 U.S. 279, 111 S.Ct. 654, 112 L.Ed.2d 755 (1991). However, under certain circumstances, a creditor may seek to except from a debtor's discharge certain debts. *See* 11 U.S.C. §§ 523(a). Nevertheless, consistent with effectuating the underlying purposes of the Bankruptcy Code, exceptions to discharge under §§ 523 are to be narrowly construed. *See Snoke*

*v. Riso (In re Riso)*, 978 F.2d 1151, 1154 (9th Cir. 1992). Notwithstanding the weighty burden, a creditor, in order to prevail, need only establish the elements of nondischargeability under 11 U.S.C. § 523, by a preponderance of the evidence. *See Grogan v. Garner*, 498 U.S. at 287-88.

### 11 U.S.C. § 523(a)(2)(A)

To establish nondischargeability as a result of fraud under § 523(a)(2)(A)[1], courts in the Ninth Circuit employ the following five-part test:

(1) misrepresentation, fraudulent omission or deceptive conduct by the debtor;
(2) knowledge of the falsity or deceptiveness of his statement or conduct;
(3) an intent to deceive;
(4) justifiable reliance by the creditor on the debtor's statement or conduct; and
(5) damage to the creditor proximately caused by its reliance on the debtor's statement or conduct.

*Harmon v. Kobrin (In re Harmon)*, 250 F.3d 1240, 1246 (9th Cir. 2001*); American Express Travel Related Services Co. Inc. v. Hashemi (In re Hashemi),* 104 F.3d 1122, 1125 (9th Cir.1996); *Apte v. Japra, M.D., F.A.C.C., Inc. (In re Apte)*, 96 F.3d 1319, 1322 (9th Cir. 1996). The determination of nondischargeability under § 523(a)(2)(A) is a question of federal, not state law and since the elements of § 523(a)(2)(A) mirror the common law elements of fraud, courts must interpret these elements consistent with the common law definition of "actual fraud" as set forth in the Restatement (Second) of Torts (1976) §§ 525-557A. *Field v. Mans*, 516 U.S. 59, 69,

---

[1] 11 U.S.C. § 523(a)(2)(A) reads:

(a) A discharge under section 727 . . . of this title does not discharge an individual debtor from any debt–

\* \* \*

(2) for money, property, services, or an extension, renewal, or refinancing of credit, to the extent obtained, by–
    (A) false pretenses, a false representation, or actual fraud, other than a statement respecting the debtor's or an insider's financial condition.

116 S.Ct. 437, 443-44, 133 L.Ed.2d 351 (1995) ("'false pretenses, a false representation, or actual fraud,'. . . are common-law terms, and...in the case of 'actual fraud,'...they imply elements that the common law has defined them to include.").

1. Intent to Deceive

The first three elements of § 523(a)(2)(A), when taken together, establish the element of intent to deceive, which the creditor must establish by a preponderance of the evidence. In other words, a creditor must establish that a debtor knowingly made a false representation, either express or implied, with the intent of deceiving the creditor. In a two-party transaction, as distinguished from a three-party credit card transaction, the alleging party must prove the elements of misrepresentation and reliance directly and by a preponderance of the evidence and not by reference to the totality of the circumstances. *Compare Turtle Rock Meadows Homeowners Association v. Slyman (In re Slyman)*, 234 F.3d 1081, 1086 (9th Cir. 2000) *with Citibank (South Dakota), N.A. v. Eashai (In re Eashai)*, 87 F.3d 1082, 1086 (9th Cir. 1996).

As to the remaining elements, a creditor sustains its burden of proof under § 523(a)(2)(A), if a Court, after considering the facts and circumstances of a particular case, answers the following two inquiries in the affirmative: 1) did the creditor justifiably rely on the debtor's representation–reliance; and 2) was the debt sought to be discharged proximately caused by the first two elements–causation.

2. Reliance

A creditor must establish that it relied on the false representations made by the debtor. *Field*, 116 S.Ct at 438 (1995). Such reliance need not be reasonable, but it must be justifiable. *Id*. As the Supreme Court held in *Field*, "a person is justified in relying on a representation of

fact 'although he might have ascertained the falsity of the representation had he made an investigation.'" *Id*. at 444 (quoting § 540 Restatement (Second) of Torts (1976)).  This standard depends upon the knowledge and experience of the person to whom the representations were made.  As the Supreme Court in *Field* further explained:

> [A] person is "required to use his senses, and cannot recover if he blindly relies upon a misrepresentation the falsity of which would be patent to him if he had utilized his opportunity to make a cursory examination or investigation.  Thus, if one induces another to buy a horse by representing it to be sound, the purchaser cannot recover even though the horse has but one eye, if the horse is shown to the purchaser before he buys it and the slightest inspection would have disclosed the defect.  On the other hand, the rule stated in this Section applies only when the recipient of the misrepresentation is capable of appreciating its falsity at the time by the use of his senses.  Thus, a defect that any experienced horseman would at once recognize at first glance may not be patent to a person who has had no experience with horses."

*Id*. (quoting § 541, Comment a., RESTATEMENT (SECOND) OF TORTS (1976)).  Interpreting this standard, the Ninth Circuit Court of Appeals teaches:  "Although one cannot close his eyes and blindly rely, mere negligence in failing to discover an intentional misrepresentation is no defense for fraud."  *Apte*, 96 F.3d at 1322.

### 3. Causation

Finally, to prevail under 11 U.S.C. § 523(a)(2)(A), a creditor must establish that a claim sought to be discharged arose from an injury proximately resulting from his or her reliance on a representation that was made with the intent to deceive.  *Britton v. Price (In re Britton)*, 950 F.2d 602, 604 (9th Cir. 1991).  "Proximate cause is sometimes said to depend on whether the conduct has been so significant and important a cause that the defendant should be legally responsible."  *Id*. at 604.  Moreover, as the United States Supreme Court explained in *Field*, a court may turn to the Restatement (Second) of Torts (1976), "the most widely accepted distillation of the common

9

law of torts" for guidance on this issue. *Field*, 116 S.Ct. at 443.

The RESTATEMENT (SECOND) OF TORTS (1976) explains that proximate cause entails (1) causation in fact, which requires a defendant's misrepresentations to be a "substantial factor in determining the course of conduct that results in loss, § 546; and (2) legal causation, which requires a creditor's loss to "reasonably be expected to result from the reliance." § 548A. *See also In re Creta*, 271 B.R. 214, 220 (1st Cir. BAP 2002). In determining the presence of proximate cause, however, courts must refrain from relying on speculation to determine whether and to what extent a creditor would have suffered a loss absent fraud. *Siriani v. Northwestern Nat'l Ins. Co. of Milwaukee, Wisc. (In re Siriani),* 967 F.2d 302, 306 (9th Cir. 1992).

### 11 U.S.C. § 523(a)(2)(B)

Section 523(a)(2)(B) excepts from discharge debt for money obtained by the use of a written statement concerning a debtor's (or insider's) financial condition. The statute reads:

> (a) A discharge under section 727, 1141, 1228(a), 1228(b), or 1328(b) of this title does not discharge an individual debtor from any debt–
>
> * * *
>
> (2) for money, property, services, or an extension, renewal, or refinancing of credit, to the extent obtained by--
>
> * * *
>
> (B) use of a statement in writing–
>    (i) that is materially false;
>    (ii) respecting the debtor's or an insider's financial condition;
>    (iii) on which the creditor to whom the debtor is liable for such money,
>      property, services, or credit reasonably relied; and
>    (iv) that the debtor caused to be made or published with intent to
>    deceive[.]

The Ninth Circuit has reworded these requirements as follows:

>  (1) a representation of fact by the debtor,
>  (2) that was material,
>  (3) that the debtor knew at the time to be false,
>  (4) that the debtor made with the intention of deceiving the creditor,
>  (5) upon which the creditor relied,
>  (6) that the creditor's reliance was reasonable,
>  (7) that damage proximately resulted from the representation.

*Siriani v. Northwestern Nat'l Ins. Co., of Milwaukee, Wis. (In re Siriani)*, 967 F.2d 302, (9th Cir. 1992); *In re Gertsch*, 237 B.R. 160, 167 (9th Cir. BAP 1999) (adopting the elements required under the companion section 523(a)(2)(A), with the additional and obvious requirement that the alleged fraud stem from a false statement in writing); *Candland v. Insurance Co. of N. Am. (In re Candland)*, 90 F.3d 1466, 1469 (9th Cir. 1996); *Avco Fin. Services of Billings v. Kidd (In re Kidd)*, 219 B.R. 278, 282 (Bankr. D. Mont. 1998); *In re Osborne*, 257 B.R. 14, 20 (Bankr. C.D. Cal. 2000).

In discussing the difference between §§ 523(a)(2)(A) and 523(a)(2)(B), the Supreme Court instructs that § 523(a)(2)(B) applies where the debt at issue "follows a transfer or extension induced by a materially false and intentionally deceptive written statement of financial condition upon which the creditor reasonably relied." *Field v. Mans*, 516 U.S. 59, 66, 116 S.Ct. 437, 133 L.Ed.2d 351 (1995). On the issue of materiality, a financial statement that leaves "any discrepancy" between the overall impression left by the statement and the endorser's true financial status gives rise to a material falsehood for purposes of § 523(a)(2)(B). *North Park Credit v. Harmer (In re Harmer)*, 61 B.R. 1, 5 (Bankr. D.Utah 1984) (citing cases); *accord Texas Am. Bank, Tyler, N.A. v. Barron, (In re Barron)*, 126 B.R. 255 (Bankr. E.D. Texas 1991) (citing cases). A "long line of cases" has held that in a personal financial statement, the "omission, concealment, or understatement of any of [a] debtor's material liabilities constitutes a 'materially

false' statement." *Harmer*, 61 B.R. at 5.

Moreover, even if a debtor does not know of inaccuracies contained in a written financial statement, the Ninth Circuit has held that reckless disregard for the truth satisfies the knowledge element of § 523 and its predecessor. *Anastas v. American Sav. Bank (In re Anastas)*, 94 F.3d 1280, 1286 (9th Cir. 1996). *See also Knoxville Teachers Credit Union v. Parkey*, 790 F.2d 490, 492 (6th Cir. 1986) (gross recklessness to the truth also satisfies the fourth element of intention of deceiving).

## 11 U.S.C. § 523(a)(6)

Section 523(a)(6) excepts from discharge any debt for willful and malicious injury by the debtor to another entity or to the property of another entity. Whether a particular debt is for willful and malicious injury by the debtor to another or the property of another under section 523(a)(6) requires application of a two-pronged test to the conduct giving rise to the injury. The creditor must prove that the debtor's conduct in causing the injuries was both willful and malicious. *Barboza v. New Form, Inc. (In re Barboza)*, 545 F.3d 702, 711 (9th Cir. 2008) (supporting the two-prong test set forth in *Carrillo v. Su (In re Su)*, 290 F.3d 1140 (9th Cir. 2002).

Willfulness requires proof that the debtor deliberately or intentionally injured the creditor or the creditor's property, and that in doing so, the debtor intended the consequences of his act, not just the act itself. *Su*, 290 F.3d at 1143. The debtor must act with a subjective motive to inflict injury, or with a belief that injury is substantially certain to result from the conduct. *Id*. at 1142. For conduct to be malicious, the creditor must prove that the debtor: (1) committed a wrongful act; (2) done intentionally; (3) which necessarily caused injury; and (4) was done

12

without just cause or excuse. *Id*. at 1146-47.

## DISCUSSION

In this case, Security First Bank has not shown that Jamey made either a verbal or a written representation to Security First Bank that was false. Ron concedes that nothing was out of the ordinary when Security First Bank inspected its collateral in late April of 2007. Jamey did not know EMC was out of trust until Karen brought the matter to his attention on May 22, 2007. Jamey notified Security First Bank that EMC was out of trust the next day. Jamey concedes that EMC was out of trust on May 22, 2007. Security First Bank has not shown that Jamey made a false representation to Security First Bank with respect to EMC being out of trust.

Security First Bank similarly failed to show that Jamey made any false representations in either EMC or Jamey's financial statements that induced Security First Bank to extend EMC's line of credit. Ron testified that a couple of Jamey's financial statements contained the exact same information. However, Karen testified that Jamey's balance sheets were accurate on the particular date that each balance sheet was prepared. Any discrepancy in Jamey's monthly financial statements does not give a false impression about Jamey's true financial status. On this point, Security First Bank has failed to sustain its burden of proof under 11 U.S.C. §§ 523(a)(2)(A) and (a)(2)(B).

Security First Bank's claim under § 523(a)(6) fails for many of the reasons just discussed. Under § 523(a)(6), Security First Bank must show that Jamey deliberately or intentionally injured Security First Bank and that Jamey intended the consequences of his act. The Ninth Circuit reversed and remanded the case in *Barboza* because the courts below did not separately analyze the "malicious" prong of § 523(a)(6), and although some overlap may exist between the two

prongs the Ninth Circuit requires a separate analysis for both the "willful" and "malicious" prongs. *Barboza*, 545 F.3d at 711; *Jett v. Sicroff (In re Sicroff)*, 401 F.3d 1101, 1105 (9th Cir. 2005); *In re Su*, 290 F.3d 1140, 1144 (9th Cir. 2002); *Transamerica Finance Corp. v. Littleton (In re Littleton)*, 942 F.2d 551, 554 (9th Cir. 1991) (per curiam); *Jercich*, 238 F.3d at 1209.

Case law dictates that this Court analyze the willful and malicious prongs of § 523(a)(6) separately. Security First Bank has the burden of proof under § 523(a)(6) to except its claim from Jamey's discharge under both prongs.

Security First Bank has not shown that Jamey's actions were either willful or malicious. Jamey's conduct was not willful because he did not deliberately or intentionally seek to injure Security First Bank. Jamey was merely trying to sell cars, and generate revenue for EMC. The evidence shows that Jamey had no idea that EMC was not paying Security First Bank as Jamey was selling cars. All Jamey knew is that he had cut his salary, borrowed money from a friend, and cashed in his retirement in an effort to keep EMC afloat while the shareholders of EMC tried to sell the dealership. Events did not unfold as the shareholders had hoped, but the unfortunate events that did unfold do not entitle Security First Bank to a judgment in its favor.

Jamey's conduct was also not malicious because Jamey did nothing intentionally without just cause or excuse. EMC was authorized to sell vehicles under its line of credit with Security First Bank and that is clearly what it did. During the period of time when vehicles were sold out of trust in late April 2007 and May 2007, Jamey was trying to sell as many cars as possible to generate revenue. Jamey was not concerned with the books, because that task was being overseen by Karen. The fact that Jamey waited one day to advise Security First Bank of the out of trust situation does not satisfy Security First Bank's burden under § 523(a)(6). Therefore,

IT IS ORDERED the Court will enter a separate Judgment in favor of the Defendant, Jamey Eisenbarth and against the Plaintiff, Security First Bank; and Plaintiff Security First Bank's complaint is dismissed with prejudice.

        BY THE COURT

        */s/ Ralph B. Kirscher*
        HON. RALPH B. KIRSCHER
        U.S. Bankruptcy Judge
        United States Bankruptcy Court
        District of Montana